UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
STEVEN E. SNYDER,

        Plaintiff,

-against-

ADVEST, INC., AXA FINANCIAL, INC.,
MERRILL LYNCH & CO., INC., and
MICHAEL T. MAYES,

        Defendants.
-----------------------------------------------------------X

**COMPLAINT**

FEB 22 2006

**JURY TRIAL DEMANDED**

Plaintiff Steven E. Snyder ("Snyder" or "plaintiff"), by his attorneys, Beranbaum Menken Ben-Asher & Bierman LLP, complaining of defendants Advest, Inc. ("Advest"), AXA Financial Inc. ("AXA"), Merrill Lynch & Co., Inc. ("Merrill Lynch") and Michael T. Mayes ("Mayes") (collectively, "defendants"), alleges as follows:

## NATURE OF ACTION

1. This action is brought to remedy claims of employment discrimination based upon plaintiff's national origin and religion, and retaliation for plaintiff having engaged in protected employment activity, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981A ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981; the New York State Human Rights Law, Executive Law §§ 290 *et seq.* (the "State Human Rights Law"); and the Administrative Code of the City of New York §§ 8-101 *et seq.* (the "City Human Rights Law").

2. Snyder seeks injunctive and declaratory relief, compensatory, punitive damages, and other appropriate relief pursuant to federal, state and municipal law.

## JURISDICTION AND VENUE

3. On June 3, 2005, plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), complaining of the acts of discrimination and retaliation alleged herein.

4. On November 22, 2005, the EEOC issued to plaintiff a "right-to-sue" letter, authorizing plaintiff to file a lawsuit claiming violations of Title VII.

5. Plaintiff has complied fully with all prerequisites to this Court's jurisdiction under Title VII.

6. Plaintiff invokes this Court's jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(4), and 42 U.S.C. §§1981 and 2000e-5(f)(3).

7. As the unlawful employment practices alleged herein occurred, and defendants regularly do business, within the Southern District of New York, venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

8. With the filing of this Complaint, plaintiff will submit copies to the NYC Human Rights Commission and Department of Law.

## PARTIES

9. Snyder is an individual of Jewish religion and national origin.

10. Advest is a financial services firm. It is a Delaware corporation doing business in New York, and has its principal executive office in Connecticut.

11. AXA is a Delaware corporation doing business, and has its principal executive office, in New York. Upon information and belief, Advest was a fully owned subsidiary of AXA at the time of the occurrence of the acts complained of herein, and

AXA exercised control of labor relations at Advest.

12. Merrill Lynch is a Delaware corporation doing business, and has its principal executive office, in New York. Upon information and belief, Merrill Lynch acquired Advest from AXA in or about December 2005, after which Advest was owned in its entirety by Merrill Lynch.

13. Having acquired Advest, Merrill Lynch assumed successor liability for the claims asserted by plaintiff in this lawsuit.

14. Upon information and belief, by the terms of its purchase agreement with AXA, Merrill Lynch is responsible for the liabilities incurred by Advest as of the time of Merrill Lynch's acquisition of the company.

15. Upon information and belief, at the time it acquired Advest, Merrill Lynch had notice of plaintiff's allegations which formed the substance of his claims set forth herein.

16. Upon information and belief, there is a substantial continuity of Advest's business operations with Merrill Lynch's purchase of the company. Upon information and belief, Merrill Lynch continues to use the same or substantially the same facilities that Advest used before the acquisition; to use the same or substantially the same work force and supervisory personnel that Advest used before the acquisition; to have the same or substantially the same jobs under the same or substantially the same working conditions that Advest had before the acquisition; to use the same or substantially the same machinery, equipment and methods of production that Advest used before the acquisition; and to produce the same or substantially the same product, namely financial brokerage and investment banking services, that Advest produced before the

acquisition.

17. Upon information and belief, Merrill Lynch exercises control of labor relations at Advest.

18. Defendant Michael T. Mayes, at all relevant times, was a Senior Managing Director at Advest and Head of Advest's Investment Banking Department ("IBD"). Mayes is an "employer" as that term is understood by the State Human Rights Law and the City Human Rights Law.

## FACTUAL ALLEGATIONS

19. Snyder has a B.S. from Cornell University, an M.S. from the Massachusetts Institute of Technology and a M.B.A. from the Yale University School of Organization and Management. Since 1978, he has worked in the area of real estate investment banking and finance. In 1991, Snyder co-founded and became Managing Director of Windham Associates, a real estate investment banking and finance group. In 1995, Snyder was appointed Vice Chair of the New York State Housing Finance Agency, Director of the New York State Mortgage Agency, and Vice Chair of the New York State Affordable Housing Corporation. Prior to assuming the above positions, Snyder held senior investment banking positions at several major bracket U.S. and international investment banks.

20. In or about January 2004, Joseph Blair ("Blair"), Executive Vice President of Capital Markets and Investment Banking, recruited Snyder to work as a Managing Director in Advest's IBD office in New York City, with a focus on the real estate sector.

21. In his interview with Snyder, Blair stated that he anticipated that Snyder would need at least a year to develop business before bringing in revenue to the firm.

4

Snyder told him that he thought he would need six to nine months.

22. In early February 2004, Advest offered Snyder a Managing Director position, with a base salary of $150,000.00 and an incentive bonus of up to 40% of gross revenue per year.

23. In the offer letter, Advest promised that Snyder would be provided with an administrative assistant and junior professional personnel, as well as computer and other equipment necessary for Snyder to perform his job functions.

24. Snyder accepted the offer of employment on or about February 27, 2004, and started working for Advest on or about March 8, 2004.

25. Upon information and belief, at the time of his hire, no one involved in the hiring decision, including Mayes, knew that Snyder is Jewish.

26. Snyder was one of the only Jews in Advest's IBD. The great majority of the Advest investment banking professionals were Catholic and/or Irish-American. Upon information and belief, Advest Chairman, President & CEO Dan Mullane, Managing Director Alex Clark, Sr. Managing Director Philip Skidmore, Managing Director Robert Keane, Managing Director Michael McClintock, Managing Director Rob Looney, Vice President John Grant, Director Steven Gilhooley and Associate Aaron DiRusso are all Catholic and Irish-Americans. Upon further information and belief, Mayes is Italian-American and Irish-American. The Advest website describes Mullane as having been named one of the "50 Most Influential Irish Americans on Wall Street" by *Irish America Magazine*.

27. Shortly after Snyder started working at Advest, Mayes and others at the New York office learned that he is Jewish.

5

28. On or about March 16, 2004, one of Snyder's subordinates, Thomas Howland ("Howland"), Vice President, came into Snyder's office, looked around and stood directly in front of a book, *The Gifts of the Jews*. Howland then sat down in front of Snyder's desk, put his feet up on the desk and screamed that he would never work for a person like Snyder.

29. At a lunch with Mayes on or about March 22, 2004, Snyder told Mayes about the incident with Howland, and said that he believed that Howland's outburst was motivated by anti-Semitism. Snyder also told Mayes that he celebrates Passover, not Easter.

30. Mayes dismissed Snyder's concerns about Howland, stating, in words to the effect, "come on, you must have had worse things happen to you in your days working on Wall Street."

31. Upon information and belief, Mayes failed to discipline Howland for his hostile and discriminatory conduct toward Snyder. To the contrary, one month later, in April 2004, Mayes promoted Howland from Vice President to Director.

32. In April 2004, Snyder informed Blair of the incident with Howland and Mayes' failure to take remedial action. Snyder said that he believed that he was being subjected to discrimination. Although Blair acknowledged that there was "a problem" with Howland's and Mayes' treatment of him, on information and belief, Blair did not remedy the situation.

33. Snyder suffered disparate treatment in the terms and conditions of his employment because of his Jewish religion and national origin. Among other things:

   a. Contrary to promises in his offer letter, Snyder was never assigned an

6

administrative assistant, was not provided with adequate staff support, and was not given a computer until several weeks after commencing employment;

    b.    IBD's junior personnel were not made available to Snyder. Mayes agreed to allow Snyder to hire an associate, but then revoked permission after Snyder had gone to the trouble of interviewing candidates and selecting the most qualified;

    c.    When Snyder first began working at Advest, he was placed in an office far removed from Mayes', located next to the kitchen and the associate pool. Even when a Managing Directors' office next to Mayes' office became vacant, Mayes had a junior level professional rather than Snyder move there;

    d.    Mayes excluded Snyder from meetings that his senior position should have entitled him to participate in. After the March 2004 lunch, Mayes never again asked Snyder to lunch;

    e.    Snyder learned that Mayes had asked Mayes' assistant to provide him copies of all of Snyder's correspondence. Upon information and belief, Mayes did not similarly review the correspondence of other Managing Directors;

    f.    On or about May 4, 2004 and on or about June 25, 2004, correspondence sent to Snyder from the United Jewish Appeal-Federation ("UJA") was opened before it was delivered to him;

    g.    Snyder received at his office a subscription to the UJA's *Jewish Week* newspaper, until the office receptionist made a point of speaking to him in whispers about the newspaper and hiding the cover page when she brought it to his office. At that point, noting the discomfort caused by his receiving a Jewish magazine at the office, Snyder canceled his subscription. The same receptionist told Snyder that it was

7

"Israel's fault that our boys are getting killed in Iraq";

h.  Defendants refused to fully reimburse Snyder for attending a business luncheon at the UJA. Indeed, someone at Advest crossed out the UJA luncheon item on Snyder's expense receipt. A substitute expense was used to mask the refusal of this reimbursement;

i.  Mayes told Snyder that Gilhooley, an IBD Director, refused to work with him. When Snyder asked Gilhooley about this, Gilhooley denied that he had said anything of the sort and said that he did not know why Mayes would make such a statement;

j.  Mayes prevented the issuance of a press release announcing Snyder's hire, and also, on information and belief, refused to include Snyder's biographical information in IBD's "pitch" book distributed to clients and on Advest's intranet.

34.  Notwithstanding the disparate treatment to which he was subjected, Snyder's work performance was excellent.

35.  When defendants fired Snyder in August 2004, after less than five months of employment, he was in the process of developing deals worth approximately $16 million in fees to Advest, which, in turn, would have resulted in an incentive bonus of approximately $6 million to Snyder.

36.  Before Snyder's termination, defendants had notice of the substantial number of deals on which he was working. Snyder's deals in process were all noted on the Transaction Status Reports that Mayes compiled.

37.  On August 11, 2004, when Mayes notified him of his firing, Snyder had more deals in the making than most, if not all, of the other IBD professionals – all of whom were non-Jewish.

8

38. According to IBD's monthly Transaction Status Report, dated August 2, 2004, Snyder had ten current assignments for business deals (two of which he handled in conjunction with another Managing Director) and six prospective new business deals. The same Report showed that the entire IBD had only 23 deals pending at that time, meaning that Snyder was involved in 43% of IBD's deals then in progress.

39. The anticipated revenue of Snyder's deals compared very favorably with the IBD's record of having accrued just $1.2 million in gross revenue for the period January through September 2004.

40. One deal which Snyder was handling when he was fired was a $175 million transaction with Health Care REIT. The deal closed on or about September 15, 2004, weeks after Snyder's termination.

41. Another deal for which Snyder assumed primary responsibility was a real estate transaction with Rosen Associates Development, Inc. Advest, through Snyder's efforts, agreed to raise $35 to $70 million in equity for Rosen Associates, for which it would receive a fee of at least $1.7 million to $3.5 million. Rosen Associates agreed to the arrangement on condition that Snyder would lead the deal and remain fully involved through the transaction's completion. Immediately before his termination, Snyder asked Mayes for final authorization to sign a retainer agreement with Rosen Associates, but Mayes refused.

42. Snyder also was responsible for contracting with a real estate group, LaQuinta Corporation, for a $60 million public offering. In July 2004, the LaQuinta deal was approved by Advest's "green light committee," composed of company's senior management members. Although the deal had been near completion, it fell through

after Snyder's termination.

43. Snyder never received a formal or informal performance review during his employment, despite Snyder's repeated requests for feedback on his performance.

44. Prior to his termination, Snyder was never warned that his performance was lacking. To the contrary, in a meeting initiated by Snyder to discuss his extensive log of deals, Mayes told him to "continue the good work."

45. On August 11, 2004, Mayes told plaintiff that he was being fired. At that time, Mayes derided plaintiff's pursuit of deals with Cliff Rosen of Rosen Associates Development, Inc., and Larry Silverstein, both of whom are Jewish.

46. Defendants subsequently sought to justify Snyder's discriminatory and retaliatory discharge by claiming that his performance was poor in that he had not brought in any revenue.

47. Defendants' proffered reason for Snyder's discharge is false and a pretext for discrimination and retaliation. Snyder was allowed to work at Advest for only five months – not sufficient time to originate business and bring in revenues. At the time of his firing, Snyder was on the verge of closing several deals, and his abrupt discharge prevented him from achieving revenue for Advest.

48. Mayes aided and abetted the corporate defendants' unlawful conduct.

### FIRST CAUSE OF ACTION:  TITLE VII DISCRIMINATION

49. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

50. In violation of Title VII, defendants Advest, AXA and Merrill Lynch discriminated against plaintiff in the terms and conditions of his employment on the

10

basis of his religion and national origin.

51. In undertaking the discriminatory conduct alleged herein, defendants Advest, AXA and Merrill Lynch acted with malice and reckless indifference to plaintiff's rights under Title VII.

52. As a direct and proximate result of defendants' discriminatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## SECOND CAUSE OF ACTION: TITLE VII RETALIATION

53. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

54. Defendants Advest, AXA and Merrill Lynch retaliated against plaintiff for opposing discrimination against him in the terms and conditions of his employment on the basis of his religion and national origin.

55. In undertaking the retaliatory conduct alleged herein, defendants Advest, AXA and Merrill Lynch acted with malice and reckless indifference to plaintiff's rights under Title VII.

56. As a direct and proximate result of defendants' retaliatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## THIRD CAUSE OF ACTION: SECTION 1981

57. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

58. On the basis of plaintiff's race, as that term is understood by 42 U.S.C. § 1981, defendants have denied plaintiff equal rights and privileges on the basis of his race.

59. In undertaking the discriminatory conduct alleged herein, defendants acted with malice and reckless indifference to plaintiff's rights under federal law.

60. As a direct and proximate result of defendants' discriminatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## FOURTH CAUSE OF ACTION: STATE HUMAN RIGHTS LAW DISCRIMINATION

61. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

62. In violation of the State Human Rights Law, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his religion and national origin.

63. As a direct and proximate result of defendants' discriminatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## FIFTH CAUSE OF ACTION: STATE HUMAN RIGHTS LAW RETALIATION

64. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

65. Defendants retaliated against plaintiff for opposing discrimination against him in the terms and conditions of his employment on the basis of his religion and

national origin.

66. As a direct and proximate result of defendants' retaliatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## SIXTH CAUSE OF ACTION: CITY HUMAN RIGHTS LAW DISCRIMINATION

67. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

68. In violation of the City Human Rights Law, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his religion and national origin.

69. In undertaking the discriminatory conduct alleged herein, defendants acted with malice and reckless indifference to plaintiff's rights under the City Human Rights Law.

70. As a direct and proximate result of defendants' discriminatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## SEVENTH CAUSE OF ACTION: CITY HUMAN RIGHTS LAW RETALIATION

71. Plaintiff repeats and realleges the allegations set forth at paragraphs 1 through 48 of this Complaint with the same force and effect as if fully set forth herein.

72. Defendants retaliated against plaintiff for opposing discrimination against him in the terms and conditions of his employment on the basis of his religion and national origin.

13

73. As a direct and proximate result of defendants' retaliatory actions, plaintiff has suffered, and continues to suffer, mental anguish, emotional distress, and other compensable injuries.

## CONCLUSION

WHEREFORE, plaintiff respectfully requests that this Court enter Judgment:

(A) Declaring that the acts and practices complained of herein are violations of Title VII, 42 U.S.C. § 1981, the State Human Rights Law, and the City Human Rights Law;

(B) Enjoining and permanently restraining defendants' said violations of Title VII, 42 U.S.C. § 1981, the State Human Rights Law, and the City Human Rights Law;

(C) Directing defendants to take such affirmative steps as are necessary to ensure that the effects of these unlawful practices are eliminated, and do not continue to affect plaintiff's employment opportunities;

(D) Directing defendants to place plaintiff if the position he would have occupied but for defendants' discriminatory conduct, and making him whole for all earnings and other benefits he would have received but for defendants' discriminatory and unlawful conduct, including but not limited to wages, bonus, pension, and other lost benefits;

(E) Directing defendants to pay to plaintiff compensatory, liquidated and punitive damages;

(F) Directing defendants to pay to plaintiff compensatory damages, including damages for emotional distress, pain and suffering, and punitive damages, as well as interest thereon;

(G) Awarding to plaintiff the costs of this action, together with reasonable

attorney's fees; and

(H) Granting to plaintiff such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a trial by jury in this action.

Dated:   New York, New York
         February 22, 2006

BERANBAUM MENKEN
BEN-ASHER & BIERMAN LLP

_____
By: John A. Beranbaum (JB 7944)
Attorneys for Plaintiff
80 Pine Street, 32nd Floor
New York, New York 10005
Tel. (212) 509-1616