UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------ x

STEVEN E. SNYDER,                          :

                Plaintiff,         :

                              :

      - against -                     :        06-CV-1426 (RMB) (FM)

                              :

ADVEST, INC., AXA FINANCIAL, INC.,         :
MERRILL LYNCH & CO., INC., and MICHAEL     :
T. MAYES,                                  :

                Defendants.        :

------------------------------ x


## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'MOTIONS FOR SUMMARY JUDGMENT & MOTION IN LIMINE


Dated: New York, New York
      March 28, 2008


                         LAW OFFICES OF STEVEN D. ISSER
                         Steven D. Isser (sisser@isserlaw.com)
                         1359 Broadway, Suite 2001
                         New York, NY  100
                         (212) 812-5096
                         *Attorneys for Plaintiff*


                         HIMMEL & BERNSTEIN, LLP
                         Tracey S. Bernstein (tbernstein@hbesq.com)
                         928 Broadway, Suite 1000
                         New York, NY  10010
                         (212) 631-0200
                         *Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page(s)

Table of Contents ........................................................................................................ ii

Table of Authorities .................................................................................................... iii

Preliminary Statement ................................................................................................ 1

Statement of Facts ...................................................................................................... 2

    A. Plaintiff's Hiring By Advest ............................................................................ 2

    B. The Howland Anti-Semitic Incident .............................................................. 2

    C. Plaintiff's Complaint of Discrimination ......................................................... 4

    D. The Discrimination Continues & The Retaliation Begins ............................. 5

    E. Plaintiff is Wrongly Terminated on August 11, 2004 .................................... 7

Argument .................................................................................................................... 9

I. Plaintiff's Retaliation Claim Should Not Be Dismissed .......................................... 9

    A. Causation ......................................................................................................... 10

    1. Temporal Proximity ......................................................................................... 10

    2. Retaliatory Animus & Evidence of Pre-Text ................................................... 12

        a. Evidence of Retaliatory Animus Supports Causation ............................... 12
        b. Defendants' Reason for Firing Plaintiff is Pre-Textual &
        Treatment is Disparate ................................................................................ 16

II. The Claim of Religious & Race Discrimination ..................................................... 19

    A. Defendants' Reason for Termination Plaintiff is Pre-Textual ....................... 19

    B. Evidence of Discrimination is Supported by the Record ............................... 19

III. AXA Financial Was Also Plaintiff's Employer ..................................................... 21

IV. Defendants' Motion *In Limine* ............................................................................ 22

Conclusion ................................................................................................................. 25

## TABLE OF AUTHORITIES

**<u>Federal Cases</u>**                                                               **<u>Page(s)</u>**

<u>Bernhardt v. Interbank of NY</u>, 18 F.Supp.2d 218, 226 (E.D.N.Y 1998) .................................. 11, 16

<u>Burlington Northern & Sante Fe Ry. v. White</u>, 126 S.Ct 2405 165 L.Ed.2d 345 (2006) ............. 15

<u>Campbell v. Gen. Mot. Corp.</u>, 1989 W.L. 152720 (W.D.N.Y 1989) ............................................ 16

<u>DeCintio v. Westchester County Med. Ctr.</u>, 821 F.2d 111, 116, n. 8 (2d Cir.1987) .................... 12

<u>Gordon v. N. Y. City Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000) .................................... 10, 11

<u>Gorman-Bakos v. Cornell Coop. Extension of Schenectady County</u>, 252 F.3d
     545, 554 (2d Cir. 2001) ...................................................................................................... 10, 13

<u>Grant v. Bethlehem Steel Corp.</u>, 622 F.2d 43, 45-46 (2d Cir. 1980) ....................................... 12, 13

<u>Hill v. Rayboy-Brauerstein</u>, 467 F.Supp.2d 336 (S.D.N.Y. 2006) ................................................ 15

<u>Kessler v. West. Cty Dept. of Social Serv.</u>, 461 F.3d 199, 207-210 (2d Cir. 2006) .................... 15

<u>Knight v. City of New York</u>, 303 F. Supp. 2d 485, 498-99 (S.D.N.Y. 2004) .............................. 12

<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973) .................................. 10

<u>Patane v. Clark</u>, 508 F.3d 106, 115 (2d. Cir. 2007) ........................................................9-10, 12, 16

<u>Rodriguez v. The City of New York</u>, 2008 U.S. Dist. Lexis 9966 (E.D.N.Y.) ........... 10, 17, 19-20

<u>Sir Speedy, Inc. v. L&P Graphics, Inc.</u>, 957 F.2d 1033, 1038 (2d Cir. 1992) .............................. 23

<u>Suggs v. Port Auth. of NY & NJ</u>, 1999 U.S. Dist. LEXIS 6319, at *6 (S.D.N.Y.) ........... 11, 12-13

<u>Sumner v. United States Postal Service</u>, 899 F.2d 203, 209 (2d Cir. 1990) .................................. 10

<u>Stephens v. State U. of NY</u>, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998) .................................... 11, 13

<u>Steffy v. Ford Motor Co.</u>, 2007 U.S. Dist. LEXIS 20524 at *32 .................................................... 13

<u>Tse v. UBS Fin. Servs.</u>, 2008 U.S. Dist. LEXIS 11915 (S.D.N.Y.) .............................................. 23

**Federal Statutes**                                                     **Page(s)**

42 U.S.C. §2000e, *et seq.* ..................................................................... 1, 19

42 U.S.C. §1981 ............................................................................. 1, 19, 25

FRE 801(c) .......................................................................................... 22, 24

FRE 801(d)(2)(c) ................................................................................. 22, 24

FRE 801(d)(2)(d) ................................................................................. 22, 24

FRE 802  ...................................................................................................... 22

FRE 803(3) ...........................................................................................22-23

FRE 803(6) ........................................................................................... 22, 24

FRE 801(2)(d)(2)(c) .................................................................................... 22

FRE 901(2)(d)(2)(c) .................................................................................... 24

FRE 1003  .................................................................................................... 24

**NY State Statutes**                                                    **Page(s)**

NYS Exec. Law §290, *et seq.* ................................................................ 1, 19

NYC Admin. Code §8-101, *et seq.* .......................................................... 1, 19

## PRELIMINARY STATEMENT[1]

On March 16, 2008, only eight days after plaintiff Steven E. Snyder ("Snyder" or "plaintiff") began his employment with defendant Advest, Inc. ("Advest") as a Managing Director ("MD") in its Investment Banking Department ("IBD"), he was subject to an anti-Semitic rant by Advest Vice President ("VP") Thomas Howland ("Howland"). Upset about this anti-Semitic outburst, on March 22, 2004 plaintiff complained to defendant Michael Mayes ("Mayes"), Advest's Senior Managing Director, Head of the IBD, and plaintiff's supervisor, of Howland's discriminatory conduct and asked Mayes to take action to address it.

Rather than address the problem of anti-Semitism, Mayes decided that plaintiff's days at Advest were numbered. As discussed below, at the March 22, 2004 meeting, or soon thereafter, Mayes decided that he would terminate Plaintiff's employment at Advest in order to be rid of this new Jewish employee who had the audacity to complain about anti-Semitic discrimination. Mayes immediately began taking meaningful steps to sabotage plaintiff's performance and/or to demonstrate to plaintiff that he was not welcome at Advest. By mid to late Spring 2004, less than three months after plaintiff engaged in a protected activity, Mayes was publicly belittling plaintiff and had confided to other another Advest MD his previously decided intention to terminate plaintiff's employment.

Finally, on August 11, 2008, about three weeks after defendant AXA Financial, Inc. ("AXA") acquired Advest, Mayes terminated plaintiff. As discussed below, at different times, defendants have advanced three different reasons for the termination. The most current being

---

[1] Plaintiff brings this action under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e, *et seq.*) ("Title VII"), the Civil Rights Act of 1866 (42 U.S.C. §1981)("Section 1981"), the New York State Human Rights Law (NYS Exec. Law §290, *et seq.*) ("NYSHRL") and the New York City Human Rights Law (NYC Admin. Code §8-101, *et seq.*) ("NYCHRL") to recover damages resulting from the discriminatory and retaliatory termination of his employment on or about

that plaintiff failed to make "progress" towards bringing in revenues to Advest during his five month tenure.[2]  This excuse, like all of defendants' others, is not supported by the evidence and is contradicted by statements made by senior Advest employees Joseph Blair ("Blair"), Executive Vice President, Head of Capital Markets and Mayes' boss, and MD Alexander Clark.

## STATEMENT OF FACTS

### A.  Plaintiff's Hiring By Advest

Plaintiff is of Jewish faith and ethnicity and has almost 30 years of investment banking experience focusing on large, complex real estate transactions.  Exhibit ("Ex.") 1, ¶¶ 12 & 19; Ex. 9; Declaration of Steven E. Snyder ("SES Decl"); Affirmation of Christopher Strianese ("CS Aff"), Ex. 2.[3]  Prior to joining Advest plaintiff was the co-founder of the investment banking firm Windham Associates, was Vice-Chair of the New York State Housing Finance Agency, Director of the State of New York Mortgage Agency and Vice Chairman of the New York State Affordable Housing Corporation.  Ex. 1, ¶19; Ex. 9; SES Decl.

In late 2003 and early 2004, plaintiff interviewed at Advest to discuss helping Advest expand into the real estate/REIT investment banking business.  Ex. 3 at 105-106, 121; Ex. 9. During his interview with Mayes, they did not discuss Mayes', or plaintiff's, expectations as to the amount of, or how long it should take plaintiff to bring in, revenue.  Ex. 2 at 62, 76 -77, 81; SES Decl.  In contrast, that topic was discussed during plaintiff's interview with Blair, who told plaintiff that if hired, plaintiff would have at least a year or two to develop business before being

---

August 11, 2004 on the basis of his Jewish faith and ethnicity/race, and for complaining about religious and ethnic/racial discrimination by a co-worker.
[2] In their brief defendants have now returned to the second reason for plaintiff termination (i.e., not bringing in revenue in the five months he was employed).  (Ex. 23.)
[3] Unless otherwise stated, all references to Exhibits refer to the Exhibits attached to the Affirmation in Opposition of Tracey Bernstein ("TB Aff.").

expected to bring revenue into the firm.[4]  Ex. 1, ¶ 21; Ex. 2 at 78-80.  Plaintiff advised Blair that he "thought" he could do it in six to nine months, although this was an expectation not a guarantee.  Ex. 1, ¶ 21; Ex.2 at 69-70, 78-81.

After the interview process, Blair and Mayes both liked Snyder and the experience and contacts he offered to Advest.  Ex. 3 at 141-142, 179-180; Ex. 8.  Contrary to Mayes' deposition testimony in which he professed concerns about hiring plaintiff, in an email to Blair dated February 2, 2004 he requested authorization to hire Snyder and stated that he was "confident [Snyder] will make money for us and will complement the growing work we are doing in the real estate/REIT area."  Ex. 3 at 119-121; Ex. 8).

In February 2004, plaintiff was offered a position as an MD reporting to Mayes.  CS Aff, Ex. 3.  The offer was memorialized in an employment agreement dated February 27, 2004 (the "Agreement") that provided for, among other things, Snyder to receive a base salary of $150,000 and a bonus of up to 40% of the revenues which were "attributable" to him.  In addition, plaintiff was to "be provided with the resources necessary to assist [him] in [his] business development and client relationships," an administrative assistant and the right to "draw on the Department's junior professional staff to assist [him] in executing client assignments." Id.

## B.    The Howland Anti-Semitic Incident

Plaintiff began his employment with Advest on March 8, 2004.  Ex. 2 at 89-90, 160.  In the afternoon of March 16, 2004, barely seven business days after he started, plaintiff was sitting in his office when VP Howland came in and leaned against one of the cabinets.  Ex. 2 at 157-161, 183.  Snyder had had some brief contact with Howland since he interviewed with him on January 8, 2004 but nothing out of the ordinary, as Howland was not hostile towards plaintiff and

---

[4] Blair's position is consistent with MD Alexander Clark's ("Clark") declaration that a newly hired banker is usually given a year, sometimes two, to bring in revenues. (Clark Decl.)

they had never had an argument. Ex. 2 at 159-160, 177-178. Further, Howland did not seem angry or hostile when he first entered plaintiff's office or during the beginning of their conversation. Ex. 2 at 163, 167-168.

On top of the filing cabinet next to where Howland was leaning were a number of books including, on the very end right next to Howland, a book called "The Gift of the Jews." Ex. 2 at 157-158, 169, 171, 183. Howland began to talk to plaintiff while also looking at, and touching, "The Gift of the Jews." Ex. 1, ¶ 28; Ex. 2 at 169, 171 – 174, 175 – 183. After a couple of minutes standing by, and examining, the book, Howland's demeanor changed, as he became angry. Ex. 2 at 162-163, 167-168, 183. Howland then sat down, rudely put his feet up on plaintiff's desk and started screaming at plaintiff, in escalating anger, for fifteen minutes, saying that "he wasn't going to work for a person like [him.]" Ex. 2 at 161-163, 178-179, 183. Howland was screaming so loudly he was overheard by Managing Director Robert Looney ("Looney") out in the hallway. Ex. 2 at 183-185.

Plaintiff was taken aback by Howland's outburst and believed it to have been motivated by anti-Semitism, as Howland had not realized that plaintiff was Jewish until he discovered the "The Gift of the Jews" in plaintiff's office. Ex. 1, ¶ 29; Ex. 2 at 180 – 182, 184, 189 – 190. Given that Howland was plaintiff's junior by two organizational levels, they hardly knew each other and was not angry or hostile until he saw "The Gift of the Jews," there is no other explanation other than anti-Semitism that makes sense for such an incredible display of disrespect by a subordinate. Ex. 2 at 180, 187-188, 199-201.

## C.   Plaintiff's Complaint of Discrimination

Plaintiff had been at Advest for only a week and was extremely concerned, as any newly hired employee would be, about complaining about discrimination. SES Decl. Plaintiff, however,

4

was so upset that he decided to bring it to Mayes attention. SES Decl. Plaintiff attempted to meet with Mayes in the day or two following the Howland incident, but Mayes was not available until the lunch meeting they had scheduled on March 22, 2008. Ex. 2 at 157, 187. During lunch with Mayes, plaintiff informed Mayes that he was Jewish after Mayes told him to have a nice Easter. Ex. 2 at 194-196, 199. Although, Mayes was surprised to hear that he was Jewish, plaintiff proceeded to tell Mayes about Howland's anti-Semitic behavior on March 16, 2004, and asked Mayes to look into the matter. Ex. 1, ¶ 29; Ex. 2 at 196-198. In response to plaintiff's reporting of discrimination Mayes demeanor changed, Mayes belittled the anti-Semitic episode, and plaintiff's reaction to it, by telling plaintiff "you must have had worse than this happen to you in your years on Wall Street." Ex. 2 at 196-197.

Defendants' argue in their Memorandum of Law that the anti-Semitic incident and plaintiff's complaint to Mayes really concerned a dispute between plaintiff and Howland regarding a potential client Acadia Realty ("Acadia"). The undisputed evidence, however, demonstrates that the Acadia dispute occurred after the March 16, 2004 anti-Semitic episode and after the March 22, 2004 complaint to Mayes. Ex. 4 at 113-125, 144, 158; Ex. 10.

**D.     The Discrimination Continues & The Retaliation Begins**

Mayes never did investigate Snyder's complaint of discrimination despite his obligation to do so under Advest's Employee Handbook on Policy and Procedures (the "Handbook"). CS Aff, Ex. 1; Ex. 3 at 261-263. Rather, Mayes' own discrimination and retaliation began almost immediately after plaintiff informed him he was Jewish and complained to him on March 22, 2004. Mayes used the above discussed Acadia dispute, which arose for the first time according to Howland at the earliest on the evening of March 22, 2004 or the very next morning (but

clearly after the March 22, 2004 lunch with Mayes), to humiliate plaintiff and to attempt to hide the true nature of what happened on March 16, 2004. Ex. 4 at 113-125, 144, 158; Ex. 10.

After learning of the Arcadia dispute, Mayes required plaintiff, an MD, and Howland, a VP with 20 years less experience than plaintiff, to each produce a list of companies they were contacting in an attempt to originate business in relation to REIT work, to avoid any further alleged "overlap." Ex. 3 at 244-46; Ex. 7; Ex. 11. Mayes testified that he also required plaintiff to clear all companies plaintiff was seeking business from through Howland. Ex. 3 at 252-255. Mayes took this position even though, as he claims, plaintiff's job depended on bringing in revenue and Howland's job as a VP did not.[5] Defendants' 56.1 ¶5; Ex. 3 at 246.

In addition, after March 22, 2004, Mayes demeanor towards plaintiff changed, Mayes avoided plaintiff, took no interest in Snyder's work, had minimal contact with plaintiff and never took any meaningful time to meet with plaintiff to go over the deals he was working on. SES Decl; Declaration of Alexander Clark ("Clark Decl."); Ex. 3 at 221, 246-252, 273-276. Moreover, despite the position taken by Mayes in his deposition, and by Advest in its EEOC filing, that Snyder was well liked by Mayes and other IBD employees, Mayes began making belittling comments behind Snyder's back to MD Alexander Clark in mid Spring 2004 and told Clark, in mid June 2004, that he, Mayes, did not hold plaintiff in high regard and was going to fire him. Clark Decl.; Ex. 2 at 273-276; Ex. 3 at 140-142, 179-180; Ex. 4 at 113-114, Ex. 23.

Mayes also delayed the issuance of a press release and intranet posting announcing that Snyder had joined Advest, which had already been approved by Mayes' boss and Advest CEO Dan Mullane ("Mullane"), by requiring that he provide comments before it could be issued and then delaying the provision of his comments. Ex. 2 at 362-366; Ex. 14.  Obviously, Mayes

---

[5] As of March 15, 2004, Howland had not been promoted to Director. (CS Aff, Ex. 4.)

delayed the issuance of the press release because he expected to fire plaintiff in the near future in due to discrimination and retaliation. Ex. 3 at 291-293, 295-296, 299-305, 308-309; Clark Decl.

In addition, when plaintiff began his employment, he was given the only office available, which was previously used as a storeroom. Ex. 2 at 116-130; Ex. 5 at 26-27. Yet, when another, more appropriate, office became available in April 2004, the office was given to Looney, only recently promoted to MD, despite plaintiff's request to be assigned the office. Ex. 2 at 118-120, 123-127; Ex. 5 at 27-30. Notably, Looney did not request the move and was surprised he was given the new office. Ex. 2 at 124-125. Plaintiff was informed that Mayes denied his request, as Mayes did not want plaintiff to be near him. Ex. 2 at 123-124.

As more fully discussed, *infra*, and further demonstrating the discriminatory actions of defendants:  (i) plaintiff never received any help from IBD associates and VPs, who repeatedly told plaintiff they were to busy to help him; (ii) Geralyn Crawford ("Crawford") failed or refused to transfer plaintiff's real estate license to Advest and began keeping track of plaintiff's whereabouts when he was out of the office; (iii) plaintiff discovered that his mail from the United Jewish Appeal ("UJA") was being opened and that Constance Mallia ("Mallia"), an Advest receptionist, acted oddly around him when delivering him mail that contained his Jewish Weekly magazine; and (iv) Advest manipulated the reimbursement to plaintiff for a legitimate business expense plaintiff incurred for a UJA luncheon. Ex. 2 at 85, 98, 142-146, 253-255, 265-279, 329, 333-335, 737-739; Ex. 5 at 37-42, 59-61, 111-119, 122-124; Exs. 30, 32; CSAff, Ex. 9.

### E.    Plaintiff is Terminated on August 11, 2004

On June 17, 2004, plaintiff met with Mayes to provide him with an update on several of the deals he was working on. Ex. 2 at 145-146, 250-251; Ex. 3 at 181-182; SES Decl. Mayes told plaintiff to keep up the good work. (Id.) Yet, at around this same time Mayes was telling

7

Clark he was going to terminate plaintiff. Clark Decl. At an August 2, 2004 monthly meeting that Mayes was present at, plaintiff again described the deals he was working on which were then reflected in the IBD's August 2, 2004 Transaction Status Report ("TSR"). Ex. 3 at 329-330, 337-339; SES Decl; CS Aff, Ex. 15. These deals had the potential to generate significant fees for Advest. Declaration of Dirk Hrobsky ("Hrobsky Decl"); Declaration of Brian Kiely ("Kiely Decl"); SES Decl.; CS Aff, Ex. 15.

Despite the concrete progress plaintiff was making to bring business in to Advest and get its real estate business up and running, Mayes called plaintiff into his office on August 11, 2004 and fired him. Ex. 1, ¶ 37; Ex. 2 at 227-228, 233 – 235. Mayes told plaintiff that the reason he was firing him was that plaintiff does big deals and Advest does small deals and it was not a good fit.[6] Ex. 2 at 229. When plaintiff attempted to change Mayes' mind by explaining that an engagement letter with Rosen Associates Development Inc. ("Rosen") was about to be signed, and generate a fee to the IBD, Mayes told him not to sign it and to take it with him. Ex. 2 at 230-231; 494, 737-739; Ex. 19; Clark Decl; Kiely Decl. When plaintiff again tried to go over the other deals he was working on, Mayes told him to get out of his office or he would have him escorted out of the building. Ex. 2 at 230.

Defendants claimed in their EEOC filing that plaintiff was terminated for failing to bring in revenues in the five months he was at Advest. Ex. 23. In contrast to both defendants' EEOC position, and Mayes' statement to plaintiff on August 11, 2004 about the size of the deals Advest was capable of, Mayes testified at his deposition that he was only looking for "concrete progress" towards achieving revenues, such as active negotiation of engagement letters. Ex. 3 at 115-116, 186-187, 193-196, 228. Yet, in firing plaintiff, Mayes was aware of but chose to ignore

---

[6] This makes no sense given AXA had just bought Advest and Snyder was told by Blair that this would give Advest the resources it needed to do larger deals. Ex. 2 at 210-212, 673-675; Ex. 33.

the "concrete progress" made by plaintiff, as several draft engagement letters had been exchanged with Rosen, an engagement letter had been sent to La Quinta Corporation, and Ascendas Corporation ("Ascendas") was negotiating and preparing an engagement letter at this time. Ex. 3 at 182-188, 198; Exs. 15-17, CS Aff, Ex. 15; SES Decl. Further, Brian Kiely of Rosen and Dirk Hrobsky of Trammel Crow & Company, Inc. ("Trammel Crow") have declared that they would have engaged Advest if plaintiff had not been terminated and Advest would have earned millions of dollars in fees. Kiely Decl; Hrobsky Decl; Ex. 19.

All of defendants' claimed reasons are also undercut by Mayes' actions before he informed plaintiff of the termination. Although Mayes claims that he did not know that plaintiff was Jewish until after he fired him, he admits that several weeks prior to terminating plaintiff he consulted with Advest's in-house counsel to obtain legal advice and get legal advice concerning the planned termination. Ex. 3 at 206, 209-210. Mayes has also testified that he allowed plaintiff to remain at Advest and to be paid until the end of September 2004, not as a "courtesy" but because he wanted plaintiff to sign a "separation agreement" releasing all legal claims. Ex. 3 at 210, 215-216. Further, Mayes admits that plaintiff was not provided with any warning that he would be terminated if his performance did not improve, or if he failed to bring in revenues. Ex. 2 at 737-738; Ex. 3 at 315. Indeed, plaintiff never received any review, criticism or warning for Mayes. Ex. 2 at 737-739.

## ARGUMENT

## I.     PLAINTIFF'S RETALATION CLAIM SHOULD NOT BE DISMISSED

In order to establish a claim of retaliation under all of the statutes, a plaintiff must demonstrate that: (1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging him; and (3) there exists a causal connection between the protected activity and the adverse action. Patane v. Clark, 508 F.3d 106,

115 (2d. Cir. 2007). Retaliation claims are governed by the burden-shifting framework set out

by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817

(1973). So long as a retaliatory motive played a part in the adverse employment actions, even if

it was not the sole cause, the law is violated. Sumner v. United States Postal Service, 899 F.2d

203, 209 (2d Cir. 1990).

Defendants concede that plaintiff meets the first two prongs, but erroneously argue that

Snyder cannot establish a causal connection. As is shown below, plaintiff's evidence establishes

a triable issue of fact as to causation.

### A.   Causation

A plaintiff may establish a causal connection between his protected activity and the

adverse employment action either through direct evidence of retaliatory animus or by

circumstantial evidence. Sumner, 899 F.2d at 209. Where there is no direct evidence of

retaliatory animus or a showing of disparate treatment, proof of causation may be shown

indirectly, by demonstrating that the protected activity was followed closely by a retaliatory

action. Gordon v. N. Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see also, Rodriguez

v. The City of New York, 2008 U.S. Dist. Lexis 9966 (E.D.N.Y.).

#### 1.   Temporal Proximity

Defendants wrongly claim that the time passage between Snyder's March 22, 2004

complaint of discrimination and his August 11, 2004 termination is too long to support a finding

of causation. According to defendants, anything beyond three months is too long a period

without other evidence to support causation. Notably, the Second Circuit "has not drawn a bright

line to define the outer limits beyond which a temporal relationship is too attenuated to establish

a causal relationship . . . ." Gorman-Bakos v. Cornell Coop. Extension of Schenectady County,

252 F.3d 545, 554 (2d Cir. 2001). Indeed, the courts of the Second Circuit have found causation

where the time between the complaint and adverse action exceeds three months. Id. (five months); see also, Suggs v. Port Auth. of NY & NJ, 1999 U.S. Dist. LEXIS 6319, at *6 (S.D.N.Y.) (six months); Bernhardt v. Interbank of NY, 18 F.Supp.2d 218, 226 (E.D.N.Y 1998) (11 months); Stephens v. State U. of NY, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998) (seven months). In addition, defendants' position is further undermined by the fact that defendants focus only on the time period between the March 22, 2004 protected activity and the August 11, 2004 termination. There is abundant evidence, however, which would allow a jury to infer that Mayes had made the decision to terminate plaintiff several months earlier, if not right after plaintiff's March 22, 2004 complaint. Clark Decl.

**First,** Clark had several conversations with Mayes in mid to late Spring 2004 in which Mayes made "unfavorable" comments about Snyder, told Clark that he did not hold plaintiff in high regard and made it clear to Clark that he was of a mind to terminate plaintiff. Clark Decl. While plaintiff's does not concede that there is some bright line cut-off date by which temporal proximity can, alone, make the causal connection, Mayes' comments to Clark certainly puts the termination decision within the three month window defendants argue is required to establish causation solely through temporal proximity. See, Gordon v. N. Y. City Bd. of Educ., 232 F.3d at 117; Steffy v. Ford Motor Co., 2007 U.S. Dist. LEXIS 20524 at *30 - 31 (W.D.N.Y. 2007)

**Second,** the jury could also draw an inference in plaintiff's favor that Mayes decided to fire him as soon as he complained about Howland on March 22, 2008. As discussed above, within a few days of plaintiff's complaint Mayes sought to humiliate plaintiff by requiring him to clear his potential business contacts with Howland. Ex. 3 at 244-46, 252-255; Ex. 7; Exs. 11 & 29. This humiliation of plaintiff, that began within a week after plaintiff engaged in protected

activity, demonstrates that Mayes already had concluded that plaintiff's days at Advest were numbered for reporting discrimination. Id; Ex. 2 at 157, 187, 194-196, 199; Ex. 11.

**Third**, Mayes response to the reporting of discrimination, which the Handbook requires him to take seriously, was to cavalierly say you must have had worse things happen to you on Wall Street. Ex. 2 at 196-197; CS Aff, Ex. 1. In addition, plaintiff subsequently complained to Mayes in April 2004 that Howland was sabotaging and undercutting him with co-workers at Advest. Ex. 2 at 204-205, 216-223; Ex. 31. Mayes, again, took no action. SES Decl. Given the above, plaintiff has raised a triable issue of fact as causation through temporal proximity.

### 2. Retaliatory Animus & Evidence of Pre-text

In addition to temporal proximity, causation is also evidenced here by the comments and actions of Mayes and other Advest employees during the period of time following Snyder's March 22, 2004 complaint of discrimination that show retaliatory animus and disparate treatment. See Patane v. Clark, 508 F.3d at 116 - 117; see also, DeCintio v. Westchester County Med. Ctr., 821 F.2d 111, 116, n. 8 (2d Cir.1987); Knight v. City of New York, 303 F. Supp. 2d 485, 498-99 (S.D.N.Y. 2004). Moreover, plaintiff's evidence establishes that defendant's proffered reason for firing plaintiff was pre-textual and retaliation was the likely reason.

#### a.   Evidence of Retaliatory Animus Supports Causation

The Court must carefully consider temporal proximity in the context of the entire record. See, e.g., Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980). Here, Mayes' callous response to Snyder's complaint at their March 22, 2004 lunch as well as the Acadia REIT list incident; his disparaging comments and admission to Clark of his desire to terminate plaintiff in mid to late Spring 2004, and his failure to warn plaintiff that he was in danger of being termianted are evidence of retaliatory animus sufficient to defeat defendants' claim that there is no causation here. See Suggs v. Port Auth. of NY & NJ, 1999 U.S. Dist. LEXIS 6319, at *6

(S.D.N.Y.) (six months between complaint sufficient where supported by evidence of animus that supervisor was angry at plaintiff and had previously wanted to fire him but did not do so); Stephens v. State U. of NY, 11 F.Supp.2d 242, 250 (W.D.N.Y. 1998) (seven month gap close enough in time that a rational jury could infer causation); Steffy v. Ford Motor Co., 2007 U.S. Dist. LEXIS 20524 at *32 – 36 (retaliation claim viable where supervisor (i) initially responded to employee's complaint of discrimination that he did not believe her, (ii) began an investigation into employee's performance 2 ½ months after the complaint, and (iii) fired her without warning or chance to rebut allegations against her 5 months after her complaint.)

Indeed, Mayes comments to Clark are part of the consistent trail of retaliatory animus that began after the plaintiff's complaint, and lead right up to his termination.  See, Grant v. Bethlehem Steel Corp., 622 F.2d at 45-46; see also, Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d at 555 (five months supports causal connection as evidence shows retaliatory actions throughout that time period).  For example, no internal announcement was made about plaintiff's hiring although Mayes' promotion in July 2004, and the hiring of another employee on the same day as plaintiff, were posted on the intranet after these events. Ex. 2 at 218-219, 264-265; Exs. 6 & 13.  Mayes, who testified press releases at Advest usually go out in first month of employment and do not require his approval, also acted to delay the public announcement of plaintiff's hiring when he ignored Bailey's entreaties to give her his comments and declined to approve the press release that Mullane, Mayes' boss, had already approved. Ex. 2 at 363-368, 381-382; Ex. 3 at 291-293, 295-296, 299-305, 308-309; Ex. 14.

In addition to Mayes' overt actions, others also took part in retaliating against plaintiff beginning shortly after the protected activity.  For example, plaintiff's request to move offices was ignored.  Instead, the office was given to Looney in April 2004, who did not want it and was

not fired three months later. Ex. 2 at 116-130. Interestingly, Mayes and Crawford contradict each other as to whose decision it was to give it to Looney. Ex. 3 at 274-277; Ex. 5 at 28-31. Moreover, neither claims to have been aware of Snyder's interest in it. Id.

On May 7, 2007, Crawford ceased her efforts to transfer plaintiff's real estate license to Advest until plaintiff complained. Crawford then made one more cursory, unsuccessful attempt in July. Ex. 5 at 37-42, 59-61, 111-119; Exs. 30 & 32. Also on May 7, 2004 (less than two months after plaintiff complained of anti-Semitism) Crawford and Mallia began tracking plaintiff's whereabouts when he was out of the office. Id. Further, Mallia told plaintiff in June 2004 that Mayes did not like plaintiff, and she had witnessed Mayes attempt to avoid plaintiff when they were in the office together. Ex. 2 at 273 - 276. Mayes and Advest also refused, and failed, to provide plaintiff with the resources he was contractually promised, such as help from associates and VPs in the IBD. Ex. 2 at 85, 98, 142-146, 221, 737-739; Clark Decl. Indeed, Snyder had to ask to hire an executive assistant in order to make up for this deficiency. Id.

While defendants argue that the connection between Mayes and these incidents is speculative, there is a fair inference to be drawn that Mayes was at least aware of, if not the driving force behind, these actions that damaged Snyder's ability to be successful. Mayes ran the office and everyone, including administrative assistants, reported to him according to both Mayes and Howland. Ex. 3 at 157; Ex. 4 at 194-195, 197. In addition, it is fair to infer that Crawford and Associate Aaron DiRusso, long-time, loyal employees of Mayes, would clearly have been aware of Mayes' animus towards Snyder. Ex. 3 at 49-50; Ex. 5 at 5-8. While they may not have participated in the decision to terminate plaintiff or been aware of the complaint of discrimination, if Mayes was telling Clark in mid to late Spring 2004 that he was going to fire

plaintiff, it seems highly plausible he had told Crawford, his assistant of 25 years who has followed him to every job he has held, of this as well. Ex. 3 at 49-50; Ex. 5 at 5-8; Clark Decl.

Defendants also ask the court to ignore this trail of retaliatory conduct, including Mayes' own conduct, because, in their view, they did not, either individually or collectively, affect the terms and conditions of plaintiff's employment.[7] Contrary to defendants' position, the Supreme Court has made clear that in retaliation claims, the scope of what constitutes an adverse employment action is not limited to discriminatory actions that affect the terms and conditions of employment. Burlington Northern & Sante Fe Ry. v. White, 126 S.Ct 2405 165 (2006). In White, the Court stated that any action that "could dissuade a reasonable worker from making or supporting a charge of discrimination" constitutes retaliation. Id. at 2409, 2412 - 13; see also, Kessler v. West. Cty Dept. of Social Serv., 461 F.3d 199, 207-210 (2d Cir. 2006).

Under the Supreme Court's view keeping track of plaintiff's whereabouts and breaching contractual commitments by depriving plaintiff of "other resources which [plaintiff] has utilized in [his] business efforts" are all the types of actions that would dissuade a reasonable employee from making or supporting a charge of discrimination, if not adverse employment actions. (Ex. 2 at 737-739; CS Aff, Ex. 3.) Thus, no matter how one views this evidence, it would be fair for the jury to infer that a causal link was met. See, White, at 2409-13; Kessler v. West. Cty., 461 F.3d at 207-210; see also, Hill v. Rayboy-Brauerstein, 467 F.Supp.2d 336 (S.D.N.Y. 2006).

Finally, the facts suggest that, after plaintiff's March 22, 2004 complaint, Mayes used the time during which the AXA acquisition was proceeding to either force plaintiff to resign or create a legitimate reason to terminate him by depriving him of the tools and benefits plaintiff

---

[7] Defendants also argue that Title VII's 300 day limitation period bars use of certain incidents to establish causation. This claim is specious. Plaintiff has also filed suit under the NYSHRL, NYCHRL and Section 1981 which all have a three (3) year limitations period and do not require

needed, and was entitled to under the Agreement, to be successful. Notably, Mayes fired plaintiff shortly after the AXA acquisition closed,[8] he was promoted to Head of the IBD, and, as discussed below, just before plaintiff started showing "progress" towards bringing in business despite the lack of help. See, Patane v. Clark, 508 F.3d at 116-117 (causal connection not based solely on temporal proximity but also on actions of superiors to drive plaintiff from her job); Bernhardt v. Interbank of NY, 18 F.Supp.2d at 226 (11 months between protected activity and firing suggested causal connection where defendant had reason to delay firing.)

    b.     Defendants' Reason for Firing Plaintiff is Pre-Textual & Treatment is Disparate

Defendants proffered reason for terminating plaintiff is clearly pre-textual and also supports a finding of animus. As noted above, since plaintiff was terminated defendants have given three contradictory reasons for the decision. Ex. 3 at 115-116, 186-187, 193-196, 228-229; Ex. 23.[9] No matter which reason defendants wish to rely on to meet their burden of articulation, the evidence here raises a triable issue as to whether it was pre-textual.

That Mayes was aware of plaintiff's significant progress in such a limited time and chose to fire him before any of it could be realized, which would have made it more difficult to fire plaintiff, is well supported. First, Mayes was aware that plaintiff was on the verge of signing an engagement letter with Rosen for a viable deal just as Mayes fired him. Clark Decl; Kiely Decl; Ex. 19. Second, only a few weeks before Snyder had put a deal involving La Quinta Corporation before Advest's Greenlight Committee (of which Mayes is a member), and was negotiating

---

administrative filings to be actionable. NYS Exec Law §296; NYC Admin. Code §8-101; 42 U.S.C. §1981; Campbell v. Gen. Mot. Corp., 1989 W.L. 152720 (W.D.N.Y 1989).

[8] The AXA acquisition of Advest closed on July 21, 2004. Ex. 2 at 639-640.

[9] In addition, the many inconsistencies in Mayes testimony (e.g., his view of plaintiff after interviewing him, the size of Howland's REIT list, etc.) would also allow a jury to infer animus. Mayes also lied when he denied ever seeing plaintiff's pitchbook and saying the final version was not authorized by Advest before being shown his handwritten notes marking up a draft. Ex. 3 at 165-169, 239-241; Ex. 34.

engagement letters with Ascendas and Trammel Crow. Hrobsky Decl; Exs. 16-17; CS Aff, Ex. 19. Third, it is fair to conclude that it was Snyder's connections and negotiations since May 2004 with Healthcare REIT that led its bankers to contact the Advest syndicate desk. Ex. 2 at 465, 470-472, 476-478; Ex. 15.

In addition, Snyder had about 10 deals listed on the August 2, 2004 Transaction Status Report ("TSR"), which Mayes was aware of and had discussed with plaintiff. Ex. 2 at 258; Ex. 3 at 188, 329-330, 337-339; CS Aff., Ex. 15. This was also more than any of the other MD at that time. CS Aff, Ex. 15. Moreover, none of the other MDs, all working at Advest far longer than five months, had brought in significant revenue as of the date of plaintiff's termination as indicated by the completed transactions pages of the August 2, 2004 and September 13, 2004 TSRs. Ex. 3 at 198; Ex. 18; CS. Aff, Ex. 15. According the August 2, 2004 TSR, Clark had closed one deal generating $25,000 in revenue for the IDB as of plaintiff's termination; yet kept his job. Id. Looney shows $197,000 in revenue by this time although he told plaintiff he did not originate it. SES Decl.; CS Aff, Ex. 15. See, Rodriguez v. The City of New York, 2008 U.S. Dist. Lexis 9966 (E.D.N.Y.)

Equally telling with regard to the legitimacy of defendants' claim of poor performance are Mayes' own actions. He did not give plaintiff any notice or warning that he was falling short of expectations. Ex. 2 at 737-739; Ex. 3 at 315. During the June 17, 2004 in which plaintiff tried to discuss his deals Mayes told plaintiff "keep up the good work," when he knew he had already decided to terminate plaintiff. Ex. 3 at 181-182; Clark Decl; SES Decl.

In addition, Mayes fired plaintiff long before the one year period Blair promised plaintiff he would be given to "ramp up." Ex. 2 at 78-80. According to Clark, a newly hired banker is usually given a year or more to get started. (Clark Decl.) This is particularly so where, as here,

17

plaintiff was not expected to bring any deals with him from his old job. SES Decl. Indeed, plaintiff was starting from scratch as Advest did not have a viable, existing real estate investment platform that he could leverage. Ex. 3 at 105-106; Ex. 4 at 35-36, 70-71. Plaintiff had to create his own real estate pitch books and gain interest in Advest by trying to leverage the AXA brand. Ex. 2 at 210-212, 409-413, 673-675; Ex. 33; CS Aff, Ex. 11.

There is also no explanation for Mayes failure to give plaintiff even the six to nine months plaintiff told Blair he thought it would take him to produce revenues. There is no evidence that Mayes' decision was based upon budgetary considerations. Plaintiff's salary of $150,000 per year was not overly burdensome given Howland and MD Michael McClintock's departures without replacement in 2004, the bulk of Snyder's pay was by way of a bonus formula and the IBD had, according to defendants', made millions that year. Ex. 2 at 117-118; Ex. 4 at 73; Ex. 5 at 27; CS Aff, Exs. 3 & 14. Despite Clark's contrary evidence, Mayes testified that he liked plaintiff and thought he was a good guy.[10] Ex. 2 at 273-276; Ex. 3 at 141-142, 179-180; Clark Decl. Moreover, Mayes was not someone who fired people easily or regularly. Indeed, Snyder was one of three people Mayes terminated in the 15 years he was Head, or Co-Head, of the IBD. Ex. 3 at 219, 225-226; Ex. 5 at 100-101. Moreover, Mayes sought the advice of an in-house lawyer when considering firing Snyder, but only talked with HR about terminating Richard Vaeder a few years earlier. Ex. 3 at 206, 209-210, 219, 221-222, 225-226. If, as defendants' claim, Mayes did not know Plaintiff was Jewish, plaintiff never complained to Mayes about anti-Semitism, and these facts played no part in plaintiff's termination, why would Mayes seek advice of counsel and place such importance on obtaining a separation agreement for an employee of only five months?

---

[10] Mayes was also less than candid when he claimed that he never talked to anyone about Snyder's performance. Ex. 2 at 339-344; Clark Decl.)

Finally, Mayes testified that he expected plaintiff to "make progress" in bringing in revenues – not necessarily signed engagement letters or closed deals – "after a few months." Ex. 3 at 115-116.   Yet, Mayes began informing Clark that he was planning to terminate plaintiff before his own time frame had been met.[11]   Id; Clark Decl.   What is obvious is that Mayes, who told Blair he thought plaintiff could make money for the firm, cut plaintiff off before he even had a chance to start for no legitimate reason. Ex. 8.

For any and all of the reasons above, plaintiff's evidence is sufficient to meet his "minimal" burden for establishing a *prima facie* case as well as establishing that defendants' reason was pre-textual and the real reason for his termination was retaliation. See, Rodriguez v. The City of New York, 2008 U.S. Dist. Lexis 9966 *31, 43-44 (evidence that supports prima facie case can also support the ultimate finding that retaliation was a motivating factor.)

## II.  THE CLAIM OF RELIGIOUS & RACE DISCRIMINATION

Material issues of fact exist which require denial of defendants' motion as to plaintiff's claim of religious and race discrimination under Title VII, §1981, NYSHRL and NYCHRL.

### A.  Defendants' Reason for Terminating Plaintiff is Pre-Textual

As defendants' have (i) conceded that plaintiff has evidence to sufficient to meet his *prima facie* case of religious and race discrimination, and (ii) articulated a legitimate, non-discriminatory reason for their decision, plaintiff need only address the issues of pre-text and evidence of discrimination.

### B.  Evidence of Discrimination is Supported by the Record

As there is sufficient evidence in the record to create a genuine issue of material fact as to whether Snyder's termination was pre-textual (see Section I(A)(2), *supra*), the Court should

---

[11] It seems implausible that Mayes actually believed that even the five months he gave plaintiff to make "progress" was realistic given that Mayes has been at his new job for two years and,

search the entire record of this case to determine if it reveals evidence from which a rational jury could infer that the lack of credibility of defendants' proffered reason for termination can be attributed to discrimination. See, Rodriguez v. The City of New York, *supra*. As discussed below, it is fair to infer that plaintiff's Jewish faith and race was a motivating factor in the decision to terminate him.

First, the evidence and arguments set forth in Section I(A)(2)(a) showing the retaliatory animus of defendants, are also sufficient to indicate a triable issue of fact as to whether plaintiff's Jewish faith and race was a motivating factor in the decision to terminate him given that it all began after Mayes learned plaintiff was Jewish. Ex. 2 at 195-196, 199.

Second, when plaintiff joined Advest none of the 15 full-time IBD employees working for Mayes in New York City were Jewish. SES Decl. Nor did Mayes or Howland know plaintiff was Jewish before plaintiff was hired. Ex. 2 at 161-169, 196-198, 171-177. On March 22, 2004, however, plaintiff told Mayes that he was Jewish and that he had been subjected to anti-Semitic behavior by Howland. Ex. 2 at 195-196, 199. Mayes' response was to (i) tell plaintiff he must have had worse things happen and (ii) not advise HR or conduct any investigation as required by the Advest Employee Handbook. Ex. 2 at 196-197, Ex. 3 at 261-263.

Third, Mayes also began a campaign to isolate plaintiff and, along with Crawford and Howland, deprive him of the tools needed to perform his duties. For example, he allowed Howland to undermine plaintiff's reputation to other Advest employees. Ex. 2 at 204-205; Ex. 31. In addition, plaintiff's mail from the United Jewish Appeal ("UJA") was being opened and Mallia would act oddly around him when delivering him mail that contained his Jewish Weekly magazine which she hid under her arm. Ex. 2 at 265-279. At one point, Mallia told plaintiff that

---

other than the deals he brought with him from Merrill, he has not signed one engagement letter. Ex. 3 at . 50-57.

Mayes did not like him. Ex. 2 at 273-276. Moreover, Advest manipulated the expense reports to avoid paying for a UJA function he attended. Ex. 2 at 329, 333-335; Ex. 12; CS Aff, Ex. 9.

It is also telling that Mayes story on key facts such as plaintiff's hiring, tenure, progress and termination is riddled with inconsistencies and contradictions and that he sought legal advice to terminate plaintiff when the person he fired prior to plaintiff he simply called HR.

## III.    AXA FINANCIAL WAS ALSO PLAINTIFF'S EMPLOYER

AXA's motion for summary judgment should be denied as AXA was plaintiff's employer. Plaintiff consents to the dismissal of his Section 1981 claim as to AXA.

Plaintiff became employed by AXA in July 2004 when AXA purchased Advest as part of its acquisition of the MONY Group Holdings, Inc. ("MONY"). Ex. 2 at 640-641, 682, 698-699; Ex. 24.   That AXA could also be found to be plaintiff's employer is established by Advest President Dan Mullane's announcement to all Advest employee's on around July 9, 2004, that Advest and AXA had formed a management committee to include both AXA and Advest management employees on it; and the fact that Advest employees reported to AXA employees. Ex. 2 at 707-709; Ex. 24.   In addition, Advest's corporate logo changed to say it was "An AXA Financial Company".   Ex. 24.   And, in an email dated August 17, 2004, Advest and AXA's Human Resource departments sent out a joint announcement to Advest employees that refers to the MONY/AXA transaction as a "merger" and provide Advest employees with copies of various AXA corporate policies that they are supposed to be familiar with. Ex. 24.

Other indicia of employment include, the fact that when Snyder was left off an invitation to hear about AXA benefits he was told by Crawford to contact AXA human resources for information. Ex. 24. AXA also was listed as Snyder's employer on a health insurance form and Advest employees were offered access to AXA's Shareplan so Advest employees could purchase

AXA stock.  Exs. 24 & 28.  Finally, Mayes testified that once AXA took over there were a lot of staff eliminations in the Hartford office.  Ex. 3 at 208.

### IV.    DEFENDANTS' MOTION *IN LIMINE*

Defendants' Motion *in Limine* is pre-mature as it asks the court to preclude testimony and documents which is only vaguely described with no context concerning its purpose or its foundation.  Indeed, defendants ask the court to rule on these objections in a vacuum without first giving the plaintiff, or his witnesses, an opportunity to be heard and lay a foundation.

**WITNESSES**: For example, defendants' seek to exclude conversations plaintiff had with third parties concerning potential deals.  Such testimony, however, may not be offered for the truth of the matter asserted, goes to state of mind, and/or meets other exceptions to the hearsay rule. FRE 801, 803(3) & (6).  Further, plaintiff's conversations, and correspondence, with non-Advest third-parties were discussed by plaintiff with Mayes and/or other Advest employees, meeting various exceptions to the hearsay rule.  Id.  These conversations between plaintiff and Advest employees also are admissible as admissions because they are attributable to Advest and/or Mayes.  FRE 801(d)(2)(c)&(d).  Plaintiff should be provided the opportunity at trial to present the specific testimony from these witnesses who are listed by plaintiff and then the Court should rule on the admissibility at that time.  A simple jury instruction can cure any potential prejudice.

**MITIGATION:** Evidence of plaintiff's economic damages after the employees of the IBD allegedly separated from Advest is admissible.  Allegedly sometime after Merrill acquired Advest, and the IBD, Merrill disbanded the IBD and this "separation" occurred.  (Ex. 3 at ; Clark Decl.)  Certain IBD employees, however, were invited by Merrill to remain at Merrill and were not fired.  Clark Decl.  At trial, plaintiff will demonstrate that based on his resume and experience (much more prestigious than Mayes' resume and experience), and the revenues he

would have been generating had he not been unlawfully terminated, it is highly likely he too would have been given the option of remaining at Merrill.  Accordingly, there are issues of fact which should be presented to the jury concerning the proper cut-off date for damages.

**JANET SNYDER:**  While plaintiff's wife was inadvertently left off plaintiff's Initial Disclosure list there is no prejudice to defendants in her testifying.  Her testimony would be limited to plaintiff's emotional distress (very common for spouses) after his termination. Plaintiff referenced Mrs. Snyder in several places during his first deposition day on February 1, 2007 and again on February 12, 2008.  Ex. 2 at 11, 74, 158, 185, 186, 253, 585-589. Defendants had plenty of time to request a deposition. Plaintiff has no objection to producing Mrs. Snyder for a limited deposition prior to trial.

**DIRK HROBSKY:** Hrbosky's testimony concerning future business deals for which Trammel Crow would have retained Advest is admissible under FRE 803(3) as statements of his "intent, plan, motive [and] design."  Further, Mayes' state of mind is not the only issue, as Hrobsky's testimony is also directly relevant to plaintiff's damages.  See, Sir Speedy, Inc. v. L&P Graphics, Inc., 957 F.2d 1033, 1038 (2d Cir. 1992); Tse v. UBS Fin. Servs., 2008 U.S. Dist. LEXIS 11915 (S.D.N.Y.)  Hrosbky's testimony at trial will be more detailed than his declaration and plaintiff should be given the opportunity to lay a proper foundation demonstrating the testimony is not too speculative before the Court precludes it.   Indeed, plaintiff will lay a foundation consistent with the law as set forth in the damages section of the Joint Proposed Jury Charge. The jury charge states, without objection by defendants, "uncertainties concerning the of amount damages" regarding lost potential bonuses "are to be resolved in plaintiff's favor" and the amount of damages awarded need only "be reasonable in light of the evidence." FRE 803(3)

Hrobsky's testimony will satisfy the standard for determining damages and he should be allowed to testify.

**DEFENDANTS' OBJECTIONS TO PLAINTIFF'S DOCUMENTS:** <u>Pxs. 17-19, 47:</u> Without waiving plaintiff's claim that these are business records [FRE 803(6)], based on discussions with AXA counsel it is believed that these objections can be dealt with by way of redaction before introduction at trial. <u>Px. 35:</u> Plaintiff will lay a foundation that this handwritten note was created by Crawford (and Mallia), as an Advest agent within the scope of her duties, and that it was created and kept in the ordinary course of business. FRE 801(d)(2)(c)&(d), 802(6). Ex. 5 at 59-61, 113-119; Ex. 32. <u>Px. 46:</u> Plaintiff will lay a foundation and this document will be offered for reasons other than to prove the truth of the matter asserted. FRE 801(c). <u>Pxs. 55, 56:</u> These documents are admissible under FRE 803(3) as statements of "intent, plan, motive [and] design" concerning potential deals sought by sought by such third party. In addition, the documents encompassing these Exhibits are admissible for the same reasons that defendants' motion *in limine* concerning conversations between plaintiff and third parties should be denied, discussed above. At trial Plaintiff will demonstrate the purpose of each document in these Exhibits and lay a proper foundation to demonstrate that each is not hearsay and/or meets an exception to the hearsay rule, such as FRE 803(3), 803(6). <u>Pxs. 62, 64 and 72:</u> These are AXA documents which are admissions and business records and, therefore simply need a foundation based on the witnesses from AXA plaintiff identified and intends to call. FRE 801(d)(2), 803(6). <u>Pxs. 73 and 74.</u> Admissible pursuant to FRE 201(b) and 803(17) as well as, with regard to Px. 73, to refresh recollection as Howland testified this document shows when he and plaintiff first discussed Acadia. FRE 803(5). <u>Px 58:</u> Kiely's declaration is admissible as he is unavailable under 804(5) as he is a resident of Coral Gables, Florida. (Kiely Decl. ¶1.)

**PLAINTIFF'S OBJECTIONS TO DEFENDANTS' DOCUMENTS:** In the Joint Pre-trial order plaintiff objected to several documents on the grounds of foundation, authentication and hearsay under FRE 802, 901 and 1003 and maintain those objections here. However, plaintiff wishes to amplify his objections to the following: Dx: S, NN, TTT: Plaintiff objects to the redactions of this information as it is not a true duplicate. Judge Maas upheld the redaction because plaintiff raised the issue too long after various deadlines had passed. However, he made no ruling as to admissibility at trial as plaintiff claims such information is relevant. Dx NNN: Original exists and will be produced. Dx. WWWW, XXXX, MMMMM: Defendants cannot put in their own self, serving EEOC submissions which contain conclusions of law, usurping function of court as well as hearsay. FRE 802. Dx. LLLLLL & AXA GG & HH: If AXA's argument is entertained, the text of this information should be redacted as the other defendants have no such argument or purpose for its use. FRE 408.

## CONCLUSION

As such, defendants' motions should be denied in their entirety, except that plaintiff consents to the dismissal of his Section 1981 claim as to AXA.

Dated: New York, New York
        March 28, 2008

LAW OFFICES OF STEVEN D. ISSER            HIMMEL & BERNSTEIN, LLP


By: _____            By: _____
        Steven D. Isser (SS 9772)                Tracey S. Bernstein (TB 0405)
1359 Broadway, Suite 2001                928 Broadway, Suite 1000
New York, NY  100                        New York, NY 10010
(212) 812-5096                           (212) 631-0200
*Attorney for Plaintiff*                 *Attorneys for Plaintiff*